**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CASE NO. 1:25CR 006** |
| **Plaintiff,** | **JUDGE J. BARRETT** |
| **v.** | **INDICTMENT** |
| **CHARLES E. JONES, and MICHAEL DOWLING,** | **18 U.S.C. § 1962(d)** |
| **Defendants.** | **FORFEITURE ALLEGATION** |

**THE GRAND JURY CHARGES:**

**COUNT ONE**
**(RICO CONSPIRACY)**

At times relevant to this Indictment:

1. Defendant **CHARLES E. JONES** served in senior executive positions for FirstEnergy Corp. and FirstEnergy Service Co. from approximately 2015 to October 2020, including President and Chief Executive Officer of FirstEnergy Corp. **JONES** was the Chief Executive Officer and a Member of the Board of Directors of FirstEnergy Corp. at the time his employment was terminated in 2020. In that capacity, **JONES** served as FirstEnergy Corp.'s primary leader and decision maker, and he directed and caused the organization to make payments. From 2015 to 2019, **JONES** received approximately $65 million in compensation, with approximately $60 million coming from performance-based pay tied, in part, to FirstEnergy's Corp. stock price.

2. Defendant **MICHAEL DOWLING** served as Senior Vice President of External Affairs of FirstEnergy Service Co. at the time his employment was terminated in 2020. In that

capacity, **DOWLING** held a leadership role, and he was involved in directing and causing the company to make payments. **DOWLING's** compensation was, in part, tied to FirstEnergy Corp.'s financial performance and growth.

3. FirstEnergy Corp. was an Akron-based public utility holding company, and in that capacity, was the parent company to numerous subsidiaries, including FirstEnergy Service Co. FirstEnergy Corp. was the parent company to entities involved in nuclear energy generation, including FirstEnergy Solutions ("FES") until in or around February 2020.

4. FirstEnergy Service Co. was a subsidiary of FirstEnergy Corp., and operated as a service company, providing legal, financial, and other corporate support services to FirstEnergy Corp. and its subsidiaries. Services provided by FirstEnergy Service Co. included corporate contributions and advocacy on behalf of FirstEnergy Corp. and its subsidiaries at the federal, state, and local levels, among other services. The President and Chief Executive Officer of FirstEnergy Corp. also served as the President and Chief Executive Officer of FirstEnergy Service Co. FirstEnergy Service Co. provided services to FES, including "external affairs," "corporate contributions," "Federal/State/Local Regulatory Affairs," and "advocacy at the Federal, State, and Local levels."

5. FES, which along with FES' subsidiary FirstEnergy Nuclear Generation, LLC ("NG"), and FirstEnergy Corp.'s subsidiary, FirstEnergy Nuclear Operating Company ("FENOC"), were involved in nuclear energy generation in Ohio, via the Perry and Davis-Besse Nuclear Power Plants (together, the "Nuclear Plants"). In March 2018, FES, NG, and FENOC filed for Chapter 11 bankruptcy, and as a result of the bankruptcy proceedings, FES (along with NG) and FENOC separated from FirstEnergy Corp. in or around February 2020.

6. Until February 2020, all of the aforementioned entities shared a common first name; indeed, conspirators often referred generically to the "company" or to the common first name ("FirstEnergy") in communications. FirstEnergy Corp. and its subsidiaries shared employees and executives; shared services such as legal, financial, IT and advocacy services; and worked together to pursue common interests and strategies, including coordinated efforts to obtain legislation providing subsidies for the Nuclear Plants. Further, FirstEnergy Corp. described its relationship with its subsidiaries in its United States Securities and Exchange Commission Form 10-K filings during the relevant period.

## THE ENTERPRISE

7. FirstEnergy Corp., and its subsidiaries, including FirstEnergy Service Co., FES and its subsidiaries, FirstEnergy Ventures Corp., FirstEnergy Properties, Inc., FENOC, Allegheny Energy Supply Company, LLC, Ohio Edison Company, The Cleveland Electric Illuminating Company, and The Toledo Edison Company, constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), that is, a group of legal entities associated in fact (hereinafter "FirstEnergy" or "Enterprise"). The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. The Enterprise was engaged in, and its activities affected, interstate commerce.

8. The principal purpose of FirstEnergy was to derive revenue through the engagement in activities involving the transmission, distribution, and generation of electricity.

9. Defendants **JONES** and **DOWLING** were employed by and associated with FirstEnergy. Although the defendants helped pursue the legal interests of FirstEnergy, the defendants also corrupted FirstEnergy by abusing their positions of trust and engaging in criminal activities in pursuit of personal and commercial gain. As described more fully below, **JONES** and

**DOWLING** used their positions within FirstEnergy to engage in schemes involving the offer, acceptance, and payment of bribes, money laundering, and witness and information tampering.

**Ohio Government**

10. The Ohio House of Representatives is an elected body of the Ohio General Assembly. Members of the Ohio House of Representatives serve two-year terms and are limited to four consecutive two-year terms. House members propose, advance, and vote on legislation.

11. The Speaker of Ohio is the leader of the Ohio House of Representatives. The Speaker guides the agenda of the chamber, presides over the House session, and provides direction to House members and staff. The Speaker also decides when bills reach the House floor for a vote and who serves in leadership positions in the Speaker's caucus. The Speaker names all committees and subcommittees and appoints all members and chairs to committees and subcommittees.

12. The Speaker is elected at the beginning of every Ohio General Assembly, which convenes its first regular session on the first Monday of January in odd-numbered years. To choose a Speaker, representatives-elect of the majority caucus in the House nominate and vote for a candidate for Speaker. The Speaker candidate who receives an absolute majority of those votes is then voted on by all House members during the first session day of the Ohio General Assembly.

13. The Public Utilities Commission of Ohio ("PUCO") is an agency of the State of Ohio charged with regulating utility services in Ohio. PUCO's mission is to assure all residential and business consumers access to adequate, safe, and reliable utility services at fair prices, while facilitating an environment that provides competitive choices. Under Ohio law, PUCO consisted of five public utilities commissioners appointed by the governor. The governor must designate one commissioner to be chairperson of PUCO. PUCO commissioners are selected from a list of individuals submitted to the governor by the PUCO Nominating Council.

## Other Individuals and Entities

14. Energy Pass-Through was incorporated in Delaware after then-Ohio Representative Larry Householder flew to Washington, D.C. on the FirstEnergy corporate jet and met with FirstEnergy executives. On or about February 8, 2017, Energy Pass-Through registered as a foreign nonprofit corporation in Ohio, specifically as a 501(c)(4) entity "to engage in activities consistent with those permitted of an organization exempt from tax under Section 501(c)(4) of the Internal Revenue Code…." The Internal Revenue Code, Title 26, United States Code, Section 501(c)(4), provides for tax exempt status for social welfare organizations. A "501(c)(4)" social welfare organization may "not [be] organized for profit but operated exclusively for the promotion of social welfare[.]" 26 U.S.C. § 501(c)(4)(A). An entity may not qualify for tax-exempt 501(c)(4) status "unless no part of the net earnings of such entity inures to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(4)(B). A 501(c)(4) entity must notify the IRS of its intent to operate as a 501(c)(4) organization. 26 U.S.C. § 506. The names and addresses of contributors to 501(c)(4)s are not made available for public inspection.

15. Although Energy Pass-Through appeared to be an independent 501(c)(4) on paper, in reality it was controlled in part by **JONES** and **DOWLING**, who funded it with FirstEnergy money and directed its payments to entities they believed were associated with public officials for the benefit of the public officials and FirstEnergy. For example, FirstEnergy Corp. executives directed the formation of Energy Pass-Through and decided to incorporate the entity in Delaware, rather than Ohio, because Delaware law made it more difficult for third parties to learn background information about the entity. FirstEnergy Corp. executives were also involved in choosing the three directors of Energy Pass-Through, two of whom were FirstEnergy Corp. lobbyists. As **DOWLING** discussed with **JONES**, a 501(c)(4) was a "political tool."

16. FirstEnergy exclusively funded Energy Pass-Through through payments from FirstEnergy Service, which totaled approximately $25 million between 2017 and 2019, approximately $15 million of which was paid to Generation Now. **JONES** and **DOWLING** caused and directed Energy Pass-Through to make payments in 2018, 2019, and 2020, including payments to Generation Now.

17. Larry Householder represented Ohio's 72nd District in the Ohio House of Representatives from January 2017 to June 2021. Householder served as the Speaker of the Ohio House of Representatives from January 7, 2019 to July 30, 2020.

18. Generation Now was a self-titled 501(c)(4), organized under the laws of Delaware, registered in Ohio, and purported to be organized primarily for a social welfare purpose under the Internal Revenue Code. Generation Now was controlled by and operated for the benefit of Householder. Householder used Generation Now as a mechanism to receive unlimited and undisclosed payments from FirstEnergy and Energy Pass-Through for his political and personal benefit. Householder communicated with **JONES** and **DOWLING** about his receipt of FirstEnergy money into Generation Now. **JONES** and **DOWLING** funded Householder's strategy to become the Ohio Speaker, which involved funding Householder's political operation and providing resources to help Householder build his "team." Householder also relied on his associates, including Neil Clark and Jeff Longstreth, to work with **JONES**, **DOWLING**, and others associated with FirstEnergy relating to Householder's receipt of FirstEnergy money for his benefit.

19. Between 2017 and March 2020, FirstEnergy Service Co. paid more than $59 million ($16,904,330.86 attributed to FirstEnergy Corp. and $43,092,505 attributed to FES) to Generation Now, which **JONES** and **DOWLING** knew was operated for the benefit of and

controlled by Householder. For example, on March 7, 2017, Longstreth emailed wiring instructions for Generation Now to **DOWLING**, noting that "*[t]his is the organization that Chuck and Larry discussed.*" In response, **DOWLING** forwarded the email internally, and carbon copied Longstreth, stating, "*Let's do $250,000 asap and we will do $1M by year-end 2017.*" Similarly, on August 1, 2017, **DOWLING** asked, "*Are we at $500k for the c(4) now?*," to which Longstreth replied, "*Yes.*"

20. "Coalition" was a purported 501(c)(4) entity. On or about May 1, 2018, FirstEnergy used Energy Pass-Through to pay $300,000 to Coalition for Householder's benefit. In 2020, Generation Now money was wired to Coalition and then to PAC to help elect candidates supported by Householder.

21. "PAC" was a federal Political Action Committee. During the 2018 election cycle, Householder and associates working on his behalf funneled at least $1,000,000 from Generation Now through PAC to pay for media buys in PAC's name to help elect candidates loyal to Householder. During the 2020 primary election, Householder and associates working on his behalf funneled over $1,000,000 from Generation Now to PAC, via Coalition, to pay for media buys in PAC's name to help elect candidates supported by Householder.

22. "Dark Money Group 1" was incorporated on or about September 21, 2018, less than two months before the 2018 General Election. In the weeks before the 2018 General Election, Generation Now wired $670,000 to Dark Money Group 1, while FirstEnergy Service Co. wired $500,000. Between on or about October 20, 2018 and November 1, 2018, Dark Money Group 1 spent all this money to pay for television, radio and print advertisements ("media buys") targeting the rivals of Householder's candidates in the name of Dark Money Group 1.

23. Samuel Randazzo was the Chairman of the Public Utilities Commission of Ohio ("PUCO") from April 2019 until November 21, 2020, when he resigned. PUCO regulates FirstEnergy Corp.'s Ohio utility subsidiaries. Prior to serving as the Chairman of PUCO, Randazzo worked for a private law firm and served as the general counsel for an industrial group of energy users whose interests often conflicted with FirstEnergy Corp.'s interests. Randazzo also was the sole owner of Company 1 and Company 2, both of which entered a contract with FirstEnergy. Randazzo, through Company 1, also entered into a consulting services agreement with FirstEnergy. Between 2010 and January 2, 2019, FirstEnergy paid Company 1 and Company 2, millions of dollars, including $4,333,333, which was wired on or about January 2, 2019, through FirstEnergy Service Co. to Company 1 for Randazzo's benefit.

**FirstEnergy Seeks Legislative and Regulatory Solutions to Increase Profitability**

24. In October 2016, FirstEnergy executives reportedly committed to its Board of Directors that the value of the company could be increased by approximately 27%.

25. In its 2016 Annual Report to Shareholders, FirstEnergy reported a weak energy market, poor demand forecasts, and hundreds of millions of dollars in losses, particularly from its nuclear energy subsidiary, FES. Given this backdrop, FirstEnergy announced future options for its generation portfolio as follows: "legislative or regulatory solutions for generation assets"; asset sales and plant deactivations; restructuring debt; and/or seeking protection under U.S. bankruptcy laws.

26. In terms of "legislative and regulatory solutions for generation assets," FirstEnergy pursued solutions at both the federal and state levels. Federally, FirstEnergy sought rulemaking by Federal Energy Regulatory Commission ("FERC") and an invocation of the government's

emergency power under 202(c) of the Federal Power Act from the Department of Energy ("DOE"). Ultimately, the federal efforts were unsuccessful.

27. In 2017, FirstEnergy also pursued state legislation in Ohio to save the power plants, including the ZEN (Zero-Emissions Nuclear Resource Program) energy proposals outlined in House Bill 178, Senate Bill 128, and House Bill 381 in 2017. All of these bills failed.

28. In or around March 2018, FES and other nuclear-generation-related affiliates of FirstEnergy Corp. filed Chapter 11 bankruptcy. Under FES's proposed restructuring plan, FirstEnergy Corp. would divest its interest in FES and its other nuclear generation assets. **JONES** and **DOWLING** continued to seek a solution for the Nuclear Plants to benefit FirstEnergy after FES filed for bankruptcy. In addition, **JONES** and **DOWLING** later pushed FES' 203 application before FERC so FES could emerge from bankruptcy.

29. Also in or around March 2018, FES announced that it would close the Nuclear Plants absent legislative action. Specifically, FES stated that it would deactivate the Nuclear Plants in the next three years but would continue normal operations of the facilities until then. With FirstEnergy Corp. and other subsidiaries, FES also announced that it was seeking a legislative solution as an alternative to deactivation of the Nuclear Plants.

30. Ohio House Bill 6 ("HB 6") was proposed legislation introduced in the Ohio House of Representatives on or about April 12, 2019, roughly three months after Householder became Speaker of the Ohio House of Representatives. Titled the "Ohio Clean Air Program," HB 6 was referred to the House Energy and Natural Resources Committee, which assigned the bill to a new subcommittee created by Householder, the House Energy and Natural Resources Subcommittee on Energy Generation ("Subcommittee on Energy Generation"). HB 6 allowed nuclear or solar resources to apply to be "qualifying" resources, which would make them eligible for a state subsidy

of $9 per megawatt hour produced. The legislation provided for the collection of a monthly-fixed charge to all residential, commercial, industrial, and large consumers to pay for the subsidy. Under the legislation, the subsidy was dispersed at the Direction of the Ohio Air Quality Development Authority. As passed, HB 6 added six new members to the Ohio Air Quality Development Authority, increasing the total from seven to thirteen, three of which are selected by the Speaker of the House. As passed, HB 6 also included a provision that gave an electric distribution utility, such as FirstEnergy Corp, the ability to decouple energy rates, which would allow a company to bill retail customers for a surcharge if the company's annual revenue fell below a baseline revenue. HB 6 passed the House on or about May 29, 2019 – less than two months after it was introduced. The bill passed the Senate and, on or about July 23, 2019, the House concurred and the Governor signed the legislation into law.

31. "Ballot Campaign," was a ballot issue political action committee formed to repeal HB 6 through a ballot referendum. On or about July 29, 2019, Ballot Campaign submitted to the Ohio Attorney General its petition to repeal the legislation through a ballot referendum. On or about August 29, 2019, the Ohio Attorney General approved the Ballot Campaign's second proposed summary of its referendum petition. The Ohio Secretary of State validated its initial submission of signatures the next day, meaning that the Ballot Campaign had until on or about October 22, 2019, the effective date of HB 6, to circulate its petition and collect the requisite signatures for a ballot referendum. If the Ballot Campaign was successful, the implementation of HB 6 would be stayed until the following year's general election. The Ballot Campaign failed to collect enough signatures to put the issue on the ballot for a vote by Ohio citizens, and HB 6 became effective on or about October 22, 2019. Until it dismissed its appeals on or about January 21 and 30, 2020, the Ballot Campaign continued to pursue a legal challenge to the signature

gathering process in its continuing efforts to gain additional time to gather signatures and challenge HB 6 through a ballot referendum.

32. Around the same time that FirstEnergy sought HB 6, it pursued other state legislative and regulatory action, such as changing the Significantly Excessive Earnings Test ("SEET") and eliminating the requirement that FirstEnergy's three electric distribution utilities file a new distribution rate case in 2024. In terms of SEET, the budget that was passed by the General Assembly in July 2019 shortly before HB 6, included the following language: "*For affiliated Ohio electric distribution utilities that operate under a joint electric security plan, their total earned return on common equity shall be used for purposes of assessing significantly excessive earnings*." This language allowed FirstEnergy to combine and average the earnings report for three subsidiaries —Ohio Edison, Cleveland Electric Illuminating, and Toledo Edison— which effectively could allow these wholly owned subsidiaries of FirstEnergy Corp. to avoid paying a refund to customers of the subsidiary (Ohio Edison) with a higher profitability. By combining Ohio Edison's revenue with the two other, less profitable affiliates to calculate SEET, all three affiliates would report revenues below the SEET threshold, and thus avoid paying a refund to customers. After the General Assembly passed the budget and HB 6, **DOWLING** and **JONES** celebrated, with **DOWLING** telling **JONES**, "*Huge bet and we played it all right on the budget and HB 6, so we can go back for more!*"

33. Following enactment of HB 6, which provided over $1 billion in subsidies to the Nuclear Plants, FES' Chapter 11 plan was approved. FES emerged from bankruptcy in February 2020 under its new name: as Energy Harbor. In and around March 2021, the nuclear subsidies passed in HB 6 were repealed. Energy Harbor and the two Ohio Nuclear Plants continued to operate after the repeal.

## THE RACKETEERING CONSPIRACY

34. Beginning in or about 2016 and continuing to in or about November 2020, the exact date being unknown to the Grand Jury, in the Southern District of Ohio and elsewhere, the defendants, **CHARLES E. JONES** and **MICHAEL DOWLING**, and others known and unknown to the Grand Jury, being persons employed by and associated with **Enterprise**, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conspire with each other and others known and unknown to the Grand Jury to violate Title 18 United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the **Enterprise** through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple acts indictable under 18 U.S.C. §§ 1343, 1346 (relating to honest services wire fraud), 18 U.S.C. § 1956 (relating to the laundering of monetary instruments), and 18 U.S. Code § 1512 (relating to tampering with a witness, victim, or an informant), and multiple acts involving bribery, chargeable under Ohio Revised Code § 2921.02.

35. It was part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## MANNER AND MEANS OF THE RACKETEERING CONSPIRACY

36. The manner and means by which the defendants, **CHARLES E. JONES** and **MICHAEL DOWLING**, and their co-conspirators agreed to conduct and participate in the conduct of the affairs of the enterprise, included, among others, the following:

A. It was part of the conspiracy that **JONES** and **DOWLING** used the Enterprise for the purposes of enriching and benefitting the defendants and the Enterprise, its members, and associates through the use of secret payments and

bribery schemes; of promoting and enhancing the defendants' and their conspirators' activities; of promoting and enhancing the political power of public officials through bribe payments to benefit the Enterprise, the public officials, the defendants, and conspirators; and of concealing and protecting their actions from public exposure and possible criminal prosecution.

B. It was part of the conspiracy that **JONES** and **DOWLING** strategized to increase FirstEnergy's profitability through payments to 501(c)(4)'s whom they associated with public officials in return for specific official action benefitting FirstEnergy.

C. It was part of the conspiracy that **JONES** and **DOWLING** helped create and fund Energy Pass-Through, a purported 501(c)(4) social welfare entity that was solely funded by FirstEnergy and used Energy Pass-Through and directed and caused payments from Energy Pass-Through to benefit FirstEnergy and the defendants, and as a mechanism to pay and conceal bribe payments to other 501(c)(4) entities for the benefit of specific public officials.

D. It was part of the conspiracy that **JONES** and **DOWLING**, through wire communications in interstate commerce, caused FirstEnergy to pay bribe payments to 501(c)(4) social welfare entities operating for the benefit of and controlled by public officials with the intent to conceal the bribe payments.

E. It was part of the conspiracy that **JONES** and **DOWLING**, through wire communications in interstate commerce, caused FirstEnergy to pay bribe payments through Energy Pass-Through to 501(c)(4) entities that were being used to benefit

specific public officials to conceal and disguise the nature, source, ownership, and control of the proceeds of the payments.

F. It was part of the conspiracy that **JONES** and **DOWLING** used 501(c)(4) entities as a mechanism to send bribe payments and for officials to receive bribe payments so that the payments were concealed from public scrutiny and not subject to reporting requirements.

G. It was part of the conspiracy that **JONES** and **DOWLING** agreed to pay Householder and to fund Householder's bid for Ohio Speaker of the House in exchange for Householder performing specific official action to support the Nuclear Plants and to benefit the Enterprise and the defendants.

H. It was part of the conspiracy that **JONES** and **DOWLING**, knowing that conspirators continued to pay Householder, facilitated and directed FirstEnergy to pay and continue to pay Householder, in exchange for Householder taking specific official action to benefit the Nuclear Plants, the Enterprise, and the defendants.

I. It was part of the conspiracy that **JONES** and **DOWLING** arranged for and directed bribe payments to Householder with the intent that Householder would assist in crafting and support HB 6 legislation that would go into effect and benefit the Enterprise and the Nuclear Plants; use his position as Speaker to pressure and advise public officials to take specific official action to further the legislation and efforts to ensure legislation took effect; schedule and arrange for votes to ensure passage of the legislation; and vote in favor of the legislation.

J. It was part of the conspiracy that **JONES** and **DOWLING**, individually and through conspirators and others, corruptly offered and paid money to benefit

Householder with the intent and purpose to corrupt and improperly influence Householder to support and help enact into law legislation to benefit FirstEnergy and the defendants.

K. It was part of the conspiracy that **JONES** and **DOWLING**, individually and through conspirators and others, coordinated with Householder and others working on Householder's behalf, to arrange payments for the benefit of Householder and direct official action by Householder for the benefit of FirstEnergy and the defendants.

L. It was part of the conspiracy that **JONES** and **DOWLING** caused and directed payments to benefit Householder in exchange for Householder taking specific official action to undermine the Ballot Campaign's efforts to subject HB 6 to a referendum.

M. It was part of the conspiracy that **JONES** and **DOWLING** continued to arrange for bribe payments to benefit Householder with the corrupt intent that Householder would be positioned to continue to take official action for the benefit of the Enterprise and the defendants in exchange for payment.

N. It was part of the conspiracy that **JONES** and **DOWLING** caused and directed a $4,333,333 payment of money for Randazzo's benefit with the intent and for the purpose that, in return, Randazzo would perform official action in his capacity as a public official on PUCO, as requested and as opportunities arose.

O. It was part of the conspiracy that **JONES** and **DOWLING** caused and directed the $4,333,333 payment of money for Randazzo's benefit to corrupt and

improperly influence Randazzo with respect to the discharge of his duty as a public servant with PUCO.

P. It was part of the conspiracy that **JONES** and **DOWLING**, as part of their corrupt agreement with Randazzo, discussed specific ways Randazzo could take official action for the benefit of the Enterprise and the defendants, including: advancing, supporting, and helping draft legislation that would benefit the Enterprise and would benefit the Nuclear plants; advancing, supporting, and helping draft regulatory action through PUCO to benefit the Enterprise and the defendants; and advising and pressuring public officials to support legislation and regulatory action that would benefit the Enterprise and would benefit the Nuclear Plants.

Q. It was part of the conspiracy that **JONES** and **DOWLING**, as part of their corrupt agreement with Randazzo, directed Randazzo to take official action to benefit the Enterprise and the defendants, as opportunities arose, including official action relating to the Ohio "hole," FirstEnergy's ESP IV, the Significantly Excessive Earnings Test ("SEET"), a distribution modernization rider ("DMR"), and HB 6 legislation.

R. It was part of the conspiracy that **JONES** and **DOWLING**, as part of their corrupt agreement with Randazzo, continued to and intended to continue to direct Randazzo to take official action to benefit the Enterprise and the defendants, as opportunities arose.

S. It was part of the conspiracy that, as part of their "2 big bets," **JONES** and **DOWLING** caused and directed payments for the benefit of specific public

officials with the corrupt intent that, in return, the officials would take specific official action for the benefit of the Enterprise and the defendants.

T. It was part of the conspiracy that **JONES** and **DOWLING** promised, offered, and gave money with the corrupt intent to buy influence with specific public officials by corruptly paying money to 501(c)(4)s benefiting the public officials with the intent to improperly influence the officials to, in return, take specific official action to benefit the Enterprise and the defendants.

U. It was part of the conspiracy that **JONES** and **DOWLING** promised, offered, and gave money with the corrupt intent to buy influence with specific public officials by corruptly paying money to 501(c)(4)s benefiting public officials who **JONES and DOWLING** believed were "transactional," such that the officials would take official action to benefit the Enterprise and the defendants in return for payment.

V. It was part of the conspiracy that **JONES** and **DOWLING** attempted to and did conceal their actions in furtherance of the conspiracy by destroying, concealing, and altering information and directing others to do the same.

**ACTS IN FURTHERANCE OF THE CONSPIRACY**

37. In furtherance of the conspiracy and to achieve the objectives thereof, the conspirators performed and caused to be performed the following, acts, among others:

**Pursuing Legislation Through 501(c)(4) Payments to Public Officials**

38. In pursuit of a state solution, on or about November 5, 2016, a month after the discussion about increasing FirstEnergy's value, **JONES** told FirstEnergy consultant Individual B, "*Pass on to Larry Householder. When we were talking on Weds I told him there was gonna be*

*a sense of urgency but couldn't tell him all the details. If we don't move on some type of supplant in first half of 2017 it will be too late. These plants will be shut, sold, or bankrupt. I don't have any contact info for him.*" Roughly two months later, in January 2017, **JONES** and **DOWLING** met Householder in Washington, D.C. **DOWLING** flew with Householder in a FirstEnergy jet and **JONES** stayed several nights at the same hotel as Householder, which was paid for by Individual B, a consultant for FirstEnergy. Several events were planned involving **JONES**, **DOWLING**, Householder, and Longstreth while in Washington, D.C., and during the trip, Householder's need for money to fund his speakership bid and FirstEnergy's needs for a legislative bailout for the Nuclear Plants were discussed.

39. After returning from Washington, D.C., Energy Pass-Through was created, with **DOWLING** determining where Energy Pass-Through would be incorporated, assisting in the selection of the directors. **DOWLING** later indicated that he preferred the directors listed on the Form 990 that is publicly filed with the IRS "*not be easily identified with FE.*"

40. On or about February 6, 2017, **JONES** and Householder discussed nuclear legislation and Generation Now, and a bank account for Generation Now was opened. A day later, a bank account for Energy Pass-Through was opened.

41. **DOWLING** wrote approximately a week later (on or about February 15, 2017), during a FirstEnergy executive council meeting, "We told BoD @ Greenbrier we can increase value of FE by ~ 27%. What's the best way to get there in the timeframe we promised them.

a. Exit competitive generation – sale, bankruptcy, re-reg
a. [sic] ZECs in Ohio & PA coupled with [ ] action @ FERC via DOE?
b. FES bankruptcy
c. sale of company."

42. Following the meeting, **JONES** and **DOWLING** quickly got to work. For example, the day after the meeting, FirstEnergy Service Co. wired $5 million to the Energy Pass-

Through bank account. At **JONES** and **DOWLING's** behest, FirstEnergy also began paying millions of dollars to public officials through 501(c)(4)s that they knew were operating for the benefit of and associated with those public officials.

43. From 2017 through 2020, **JONES** and **DOWLING** directed and caused payments to 501(c)(4)s entities and another entity operating for the benefit of specific public officials with the intent to corrupt and influence officials to take specific official action to further the state solution and to benefit FirstEnergy. **JONES** and **DOWLING** directed and caused the payments into 501(c)(4)s because they were unregulated and unreported. While HB 6 was pending before the legislature, **JONES** and **DOWLING** sought from the public officials specific official action in the form of pressuring and advising other officials to support the legislation, including the "decoupling" provision supported by FirstEnergy and an extension of the term of the nuclear subsidy duration to ten years; and, after HB 6 was signed into law, **JONES** and **DOWLING** sought official action to help defeat the Ballot Campaign that sought to overturn House Bill 6 through referendum. **JONES** and **DOWLING** continued to cause and direct corrupt payments into 2020.

44. In addition, **JONES** and **DOWLING** corruptly caused and directed payments to Generation Now for Householder's benefit with the intent that Householder would help pass nuclear legislation in return. For example, on or about March 16, 2017, FirstEnergy Service Co. wired $250,000 to Generation Now. Prior to the payment, **DOWLING** received the wiring instructions for Generation Now from Longstreth, who explained that *"[t]his is the organization that Chuck and Larry discussed."* Five minutes after receiving the email, **DOWLING** forwarded the email and told a FirstEnergy employee, *"Please get moving on this contribution. Let's do $250,000 asap and we will do $1M by year-end 2017."* This marked the first of four $250,000 payments that FirstEnergy Service Co. made to Generation Now in 2017, totaling $1 million. The

payment was consistent with the strategy that **DOWLING** had outlined in an internal FirstEnergy presentation, where prepared talking points explained that 2017 political contributions were "*money spent to influence issues of key importance to FirstEnergy in 2017, such as saving our baseload generation*" and that FirstEnergy's "*preferred manner of giving is through section 501(c) groups, as these are considered 'dark money' because they are not required to disclose where the donations come from.*" The talking points noted that "*the bulk of our political contributions are to c(4)s.*" The presentation listed Generation Now, Energy Pass-Through, and Coalition, among others, as 501(c)(4)s that received FirstEnergy payments in 2017. In pursuit of a federal solution, **JONES** and **DOWLING** hired consultants to lobby decision makers. But **JONES** and **DOWLING's** efforts for a federal solution were unsuccessful.

45. In continued pursuit of a state solution, FirstEnergy Service Co. wired another $250,000 to Generation Now on or about May 17, 2017, which was the second installment of the million dollars FirstEnergy gave Householder in 2017. The third and fourth installments were paid on or about August 10, 2017, following a discussion at the Greenbrier between **JONES**, **DOWLING**, and Longstreth, and on or about December 8, 2017.

46. In early January 2018, after FERC rejected DOE's NOPR a month later, seemingly closing a door to a potential federal solution, **DOWLING** texted CEO of Company C and Company C Executive afterwards, "*FERC voted down the doe nopr. Next steps TBD. Might file deactivation notices tomorrow for all FES facilities – although we are working through the pros and cons of doing that.*" A few months later, FirstEnergy did just that, in addition to FES (and affiliated debtors) filing Chapter 11 bankruptcy petitions and requesting that that the DOE declare a national emergency under Section 202(c) of the Federal Power Act for all nuclear and coal plants in PJM for a minimum of four years.

**JONES and DOWLING Place and Win Two Big Bets in Ohio**

47. **JONES** and **DOWLING's** plan for a state legislative solution for the Ohio Nuclear Plants involved funding public officials who could help pass and enact the nuclear legislation when they took office. **JONES** would later celebrate with **DOWLING** that their "2 big bets" "paid off" on the day HB 6 was ultimately signed into law.

48. As part of this plan, FirstEnergy continued making secret payments to Householder. For example, on or about March 15, 2018, two weeks before FirstEnergy's subsidiaries filed for bankruptcy protection and it requested emergency action from the DOE and following a series of phone calls between **DOWLING** and Householder, Energy Pass-Through wired $300,000 to Generation Now. On or about April 11, 2018, **JONES** met with Householder to "*[d]iscuss Speaker race and votes needed.*" On or about May 1, 2018, FirstEnergy used Energy Pass-Through to pay $300,000 to a different 501(c)(4) operated for Householder's benefit called Coalition. (Later, in 2020, Generation Now wired over $1,000,000 to Coalition, which then wired money to PAC for media buys in PAC's name to help elect candidates supported by Householder.) And, on May 4, 2018, Energy Pass-Through wired $100,000 to Generation Now. The Ohio primary election occurred days later on May 8, 2018, with Householder winning his primary along with many of his Team Householder candidates.

49. **JONES** and **DOWLING** continued their efforts in August 2018, as the general election approached. For example, after Energy Pass-Through wired $500,000 to Generation Now on or about August 16, 2018, Householder thanked **JONES** for his help, to which **JONES** responded, "*We are rooting for you and your team!*" Householder replied, "*I'm rooting for you as well ... we are on the same team.*"

50. As the general election in November approached, **JONES** and **DOWLING** focused on Ohio efforts, with FirstEnergy Service Co. paying approximately $1.5 million to 501(c)(4)s and dark money entities in the weeks before the election. For example, on or about October 9, 2018, FirstEnergy Service Co. issued a $400,000 check to Generation Now, which was presented to Householder during an in-person meeting the next day by FES' lobbyists and executive. Prior to the meeting, **DOWLING** texted **JONES** that Householder would "*learn about the $400k at this mtg.*" Householder credited **JONES** with the check, texting **JONES**, "*$400k ... thank you*" after he received it, to which **JONES** responded, 👍 $ .

51. On or about October 29, 2018, FirstEnergy Service Co. transferred $500,000 to Dark Money Group 1. The payment resulted from a meeting in **JONES**' office between **JONES**, **DOWLING**, Householder, and Longstreth a few days before (October 23, 2018). Following the meeting, **JONES** and **DOWLING** persuaded other energy-interested companies to send payments to Dark Money Group 1 on Householder's behalf. Following the meeting with Householder, **DOWLING** texted **JONES**, "*I talked to [Company C Executive]. He's going to contribute $100k to our effort with [Dark Money Group 1]. As for your [] Friday morning message to [CEO of Company B]: . . .I met with Speaker Householder a few days ago. We believe in Larry and think he can and will be Ohio's next Speaker. That's important to all of us. He has a need for a final push. We've committed $700k to the effort and I'd like to ask for your help with $100k.*"

52. The day after the general election, **JONES** texted Householder and asked, "*How did your candidates do*?" Householder responded that "*we were a net -4.*" Householder told **JONES** that "*I literally need 1 more vote for Speaker.*" **JONES** asked if Householder was "*counting [Representative 11] or not*?" and stated that, "*I'll make sure that one happens.*" Later that day, Householder asked **JONES** "*If you would just ask [Individual C] to set up a meeting w*

*me and engage in getting this Spkrs race worked out so the way we want it. That would be perfect. Need him to focus.*" **JONES** responded, "*On it.*"

53. A few days before Householder's speakership vote, **DOWLING** texted an update about what he had heard regarding the Speaker's race, specifically the amount of votes Householder needed through a combination of Republican and Democrat support. **DOWLING** concluded, "*Gotta get to 50.*"

54. On January 8, 2019, the day after Householder was elected Speaker **JONES** texted Householder 👍😀. Householder responded: "*[t]hank you for everything it was historical.*" In a separate text exchange that day, Individual C texted **JONES**, **DOWLING**, and another, "*Congrats Chuck and **DOWLING**. Big win in Ohio Speaker vote,*" and then, "*2019 could be FE's year.*" **JONES** responded, "*Hate to say this but we still need to get DOE help for plants so we can use Ohio to help the parent.*" Shortly after his election, Householder created a standing subcommittee on energy generation, laying the groundwork for HB 6.

**<u>Installing Supportive State Regulator</u>**

55. Following the general election in 2018, **JONES** and **DOWLING** also pushed for a "2-person PUCO deal" through which two FirstEnergy-approved appointments would be selected to the PUCO Board. The strategy included efforts to have Randazzo appointed PUCO Chairman.

56. On December 18, 2018, **JONES** and **DOWLING** met with Randazzo at Randazzo's condominium. During the meeting at Randazzo's condominium, **JONES**, **DOWLING**, and Randazzo discussed payments to Randazzo and Randazzo's candidacy for the open PUCO chair position.

57. Later that evening, Randazzo texted **JONES** and **DOWLING** a list of remaining payments under a purported agreement with FirstEnergy Corp. from 2019 to 2024. The payments totaled $4,333,333. Randazzo added, "*Thanks for the visit. Good to see both of you,*" to which **DOWLING** responded immediately, "*Got it, Sam. Good seeing you as well. Thanks for the hospitality. Cool condo.*"

58. The next day, **JONES** texted Randazzo, "*We're gonna get this handled this year, paid in full, no discount. Don't forget about us or Hurricane Chuck [JONES] may show up on your doorstep! Of course, no guarantee he won't show up some time anyway.*" **JONES** then attached an image of a venomous snake protruding from a hurricane. Randazzo replied, "*Made me laugh – you guys are welcome anytime and any whereI [sic] can open the door. Let me know how you want me to structure the invoices.*" Randazzo then added, "*I think I said this last night but just in case – if asked by the administration to go for the Chair spot, I would say yes.*" Consistent with their prior understanding, on or about December 21, 2018, **DOWLING** texted **JONES**, "*I think they're going for the 2 play at the PUCO – with Sam as chair and [Individual E] as Commissioner.*"

59. After meeting with Randazzo in December 2018 to discuss the payout and Randazzo's candidacy for PUCO Chairman, **JONES** and **DOWLING** pushed to have Randazzo appointed as the PUCO Chairman so that Randazzo could further FirstEnergy's interests in that role through official action.

60. On or about January 2, 2019, FirstEnergy Service wired $4,333,333 to Randazzo's Company 1 bank account, which represented the amount designated in an amended agreement from 2019 through 2024, and the amount that Randazzo, **JONES** and **DOWLING** had discussed

following their condo meeting. Following the payment, in fact the same day, **DOWLING** texted **JONES** and forwarded a message from Randazzo. In the message, Randazzo stated:

> *Mike, I would like to come to Akron on 1/10, 1 /11, 1/14 or 1/15 to get a better understanding of the "hole" (size, shape, life expectancy and so on). Also, I would like to discuss a couple concepts that I landed on after our recent meeting. If Chuck is available to discuss concepts, that would be a plus. If none of the above days work, get me a couple that do, please.*

61. **JONES** responded with a date and time for meeting Randazzo, then stated: "*So you're saying Sam as Chair and [Individual E] on later*?" **DOWLING** replied, "*That's their plan, but nothing certain until Sam's meeting*." **JONES** and **DOWLING** kept the meeting with Randazzo closely held. When **DOWLING** asked whether there was anyone they should include internally, **JONES** replied, "*I think just you and me. Don't want too many on the inside right now. That's probably his preference also*." **DOWLING** then forwarded a text from Randazzo: "*From Sam. Probably best if it is you and Chuck. If more is required, I can follow up. I don't think that we will get into the weeds. That can come once we get comfortable with a conceptual framework*."

62. Two days later, on or about January 4, 2019, **DOWLING** and **JONES** discussed through text message the status of Householder's speakership and Randazzo's PUCO nomination. **DOWLING** texted that Randazzo called and *"The idea of a combination of Sam and [Individual E] was discussed – with Sam staying until [Individual E] gets re-nominated. More to Come*."

63. A week later, on or about January 11, 2019, **DOWLING** forwarded to **JONES** a text message that read, "*Resumes to the Nominating Council are due on Jan. 17. Once it's known Sam applied, the world will know*."

64. On or about January 14, 2019, **DOWLING** texted **JONES** about a presentation he was making the next day to the FirstEnergy Board of Directors, in which **DOWLING** would discuss the "*Ohio hole*," "*extending our ESP*," and "*fixing SEET test*." **DOWLING** then texted

**JONES** about the timing of what would become HB 6: "*Sam was talking about the number of weeks needed for him to coalesce parties on the broad construct of an energy bill. Before introduction.*" According to **DOWLING**, Randazzo estimated "*the 6 to 8 week time frame to pull together (not necessarily pass) the legislative component assumes that the new administration makes the appointment ASAP and runs from the date of the appointment.*"

65. On or about January 18, 2019, **JONES** texted **DOWLING**, "*...Once Sam is announced, we need him to help with [Individual E]. Sounds like he already did but will need more.*"

66. On or about January 28, 2019, **DOWLING** texted **JONES** about a solution to the Ohio "hole" and an update on Randazzo's nomination: "*Chuck – [Individual G] and I just finished a good meeting with Sam Randazzo on the way to solve the 2024 issue. No one internal knows we met with him.*"

67. Around this time, FirstEnergy became concerned that Randazzo would need to pull out of the PUCO selection process because a disclosure in connection with a FES bankruptcy filing indicated that Company 1 had received payments from FES. In response to the news, **JONES** lamented in a text message to **DOWLING** on or about January 30, 2019, "*Great. Now we have none on the list.*" **DOWLING** responded, "*This is awful.*" **JONES** then texted, "*Back to legislative fix for Ohio hole.*"

68. On or about January 31, 2019, **DOWLING** texted **JONES**, "*Nominating Council has been delayed and is now in Executive Session*"; "*Check email.*" **JONES** texted back roughly two hours later, "*Any word*"; to which **DOWLING** responded, "*Not yet. Hoping soon. You'll be my first call.*" **DOWLING** later forwarded a message, which listed the vote totals for candidates and confirmed, "*Sam got the most votes.*"

69. The next day, after Randazzo cleared the selection process, **JONES** texted Randazzo, "*Most of the media coverage is very fair. There will be some shots taken but that's inevitable. Hang in there til it's done and it will quiet quickly.*"

70. **JONES** and **DOWLING's** plan to get Randazzo appointed PUCO Chairman was successful—on or about February 4, 2019, Randazzo was selected as the Chairman of PUCO. That day **JONES** texted Company C Executive, "*Now work on the Sam/[Individual E] parlay. Once Sam is in he'll help with [Individual E] and my Speaker friend will too.*" The next day, **JONES** texted Randazzo, "*Congratulations*!" Randazzo responded, "*Thanks Chuck – the last four days have been tuff.*" Randazzo went on, "*Thanks goes to some great good friends.*"

**Ohio Bets Pay Out: FirstEnergy "Win(s) the National Championship"**

71. **JONES** and **DOWLING** next trained their sights on Ohio legislative and regulatory action benefitting FirstEnergy, such as legislative action called "SEET," millions per year through a "decoupling" provision in HB 6, and action closing the "2024" Ohio "hole"— or as they were internally referred to collectively—"Win[ning] National Championship."




72. FirstEnergy was actively involved in drafting the nuclear legislation that would become HB 6. This included a "decoupling" provision that would guarantee millions of dollars per year in fixed income to FirstEnergy Corp. On or about April 13, 2019, the day after HB 6 was introduced to the Ohio House of Representatives, **DOWLING** emailed FirstEnergy Corp. employees, "*Have we developed talking points on our decoupling language? We're going to need to aggressively defend it.*"

73. Following opponent testimony in a House subcommittee that challenged HB 6 on April 23, 2019, **DOWLING** told **JONES**, "*Today was opponent testimony. Went long. Expected stuff. Tell LH to put on his big boy pants. Ha.*" Later that day, **JONES** forwarded **DOWLING** the

content of a message from Householder that read, "*I hope FES is ready for a fight because the first shot was fired at us tonight. Nobody screws with my members ... my name ain't [Representative 10] or [Representative 1]. I asked [Individual D] to make ads this morning.*" **JONES** then texted **DOWLING**, "*FES Needs [sic] to pay for these ads*," explaining, "*they can spend some money on the real fight.*" **JONES** later texted Householder, "*I will be pushing FES to engage*," and then followed up, "*I'll talk to FES tomorrow about paying for [the ads.] What kind of budget?*"

74. The next day, **JONES** texted Householder, "*Spoke to FES creditor rep. They will step in and help.*" Householder responded that he was having breakfast with Longstreth to discuss and would call **JONES** after they met. Householder responded to **JONES**, "*I may want to run things past Jeff to make sure [Individual D] doesn't overcharge. . . . I'm cheap.*" **JONES** replied to Householder, "*OK. I would say you are a bargain – not cheap.*"

75. From April 30 to July 5, 2019, while HB 6 was pending before the Ohio legislature, FirstEnergy accounts deposited $15 million into Generation Now.

76. While HB 6 was pending before the legislature, **JONES** and **DOWLING** sought official action from specific public officials in the form of pressuring and advising other officials to support the legislation, including the "decoupling" provision supported by FirstEnergy and an extension of the term of the nuclear subsidy duration to ten years.

77. For example, on or about June 27, 2019, after Householder told **JONES** that "*House / Senate negotiations are occurring,*" **JONES** responded, "*Negotiate hard. 10 years and decoupling back in!*" Householder then replied, "*10 years ?*"; "*[FES Executive B] told me $148M for 6yrs was what was necessary.*" **JONES** then responded, "*I was told you knew about it. They fucked up. You'll be fighting this same issue in 5 years because they will not be able to take it public without more years.*"

78. On or about June 28, 2019, **DOWLING** texted **JONES**, "*Just heard from Sam.. decoupling looks good.*" Decoupling was the provision in HB 6 that guaranteed between $30 and $50 million in fixed revenue annually for FirstEnergy.

79. **DOWLING** explained to FES Executive A on or about July 10, 2019, that Randazzo told **DOWLING**: "*I am engaged and hope I can help.*" **DOWLING** went on, "*Having Sam engaged is key. He doesn't use the word lightly.*"

80. On or about July 11, 2019, **DOWLING** texted **JONES**: "*Chuck – I had a long talk with Sam last night about audit language. He is mtg today with [Senator 4] and Senate counsel. We have a good plan to help. Just wanted u to know your team is engaged and helping – and we will get it if we can keep fes from negotiating against themselves.*"

81. On or about July 13, 2019, **JONES** texted **DOWLING** and others, "*Why are these guys beating their head against the wall still. I thought they were gonna stand down til after the budget is done? What are you hearing from Sam?*" **DOWLING** responded, "*What I'm hearing is two things as to the audit. Sam thinks he has it nailed and the language works. Confidentially, [FES Executive B] agrees. Plus, we are going to have another bite at the apple after the bill is introduced. Everyone need to stay cool, negotiate with Sam, express real concerns and we will win.*"

82. On or about July 13, 2019, **JONES** texted **DOWLING** and others that he told Householder "*why 10 years is a must*" and Householder is "*on board with pushing HB 6 to 10.*"

83. On or about July 14, 2019, when FES Executive A texted **DOWLING** asking whether new HB 6 language "*corrected audit language and these changes we discussed w you this AM,*" **DOWLING** responded, "*[Senate Counsel] is supposed to cobbling together a new bill and he is under orders to share it with the administration. When that sharing happens, I'll know it –*

*so it hasn't happened yet. As for wats in it, I'm not worried. I hope it get all of our stuff right, but if it doesn't we will get it fixed before passage.*"

84. Also on or about July 15, 2019, **DOWLING** texted **JONES**, "*Audit language is behind us. All good on that front*" and that certain public officials were "*working the years issue hard.*"

85. Later that evening, **JONES** attempted to reassure FES Executive A, who had expressed concerns about the term of years for the subsidy, by responding that Randazzo and other officials were working on the issue and that the "*Conference on budget is ongoing and Speakers delegation is gonna try to negotiate budget movement for tenure on HB6. Everything that can be done is being done. If we don't get it, we work to pass an addendum as soon as [Senator 3] is out.*"

86. The next day, when FES Executive A again texted **JONES**, "*House doesn't have quite enough votes,*" **JONES** responded, "*Larry is negotiating. I'm in the loop.*" That same day, **JONES** also texted **DOWLING**, "*Some big concessions by the speaker on the budget. Hopefully he did a little horse trading along the way.*" That day, **DOWLING** texted **JONES**, "*HB 6 passed committee (with decoupling). 9-4 vote. No additional years for FES – 7 years.*" HB 6 then went back to the House for a vote on the Senate's amendments to the bill, and **DOWLING** texted **JONES**, "*Now I'm hearing the Speaker is scrambling for one vote.*"

87. On or about July 16, 2019, **DOWLING** and **JONES** texted relating to the status of HB 6, the SEET language in the budget, and help from Randazzo and other officials for additional years for the subsidy. **DOWLING** then texted that decoupling "*[w]ill be offered tomorrow by [Senator 5] with help from [Senator 6]. Stupid they're making her offer it, but we are convinced there's no monkey business. It's greased.*"

88. On or about July 23, 2019, the day that HB 6 was signed into law with the decoupling provision included, **DOWLING** texted **JONES** a screenshot showing HB 6 passing with 51-38 votes with the message: "*Boom! Congrats. This doesn't happen without ceo leadership.*" Then the following exchange occurred:

| | | |
|---|---|---|
| CJ | **Charles Jones**<br>We made a bbiiiiiiig bet and it paid off. Actually, 2 big bets. Congrats to you and the entire team! See if Matt has any Pappy and we'll all head to Columbus tonight. | 11:42 AM |
| MD | **Michael Dowling**<br>Huge bet and we played it all right on the budget and HB 6 - so we can go back for more! | 11:49 AM |
| MD | **Michael Dowling**<br>No party tonight. We are going to plan one with the Speaker later. | 11:49 AM |

89. That same day, **JONES** also sent to Randazzo a photo-shopped image of Mount Rushmore with the face of Randazzo, alongside **DOWLING**, a FirstEnergy employee, and Company C Executive, imposed over the four presidential faces with the caption, "HB 6 FUCK ANYBODY WHO AINT US."

**FirstEnergy Pays for a "Quick Fix" to Preserve HB 6**

90. After a ballot campaign formed to repeal HB 6 through a ballot referendum, **DOWLING** initially expressed concern about the referendum before understanding Householder's involvement. Regardless, **JONES** and **DOWLING** were confident they could defeat the effort through Householder-backed legislation that would declare HB 6 a "tax," making it referendum-proof under Ohio law. As **DOWLING** texted FES Executive A, on or about July 24, 2019, "*I had a good conversation with Speaker H today re: the referendum issue. I think you're in excellent hands. I know more about his personal involvement and engagement. We should all be following his lead. I know you/fes are and we will as well.*" In the months that followed, FirstEnergy accounts and Energy-Pass Through paid millions of dollars to Householder

through Generation Now to ensure the Ballot Campaign failed, and Householder agreed to pass new legislation characterizing HB 6 as a referendum-proof "tax" on Ohio citizens.

91. **JONES** and **DOWLING** knew that if the ballot referendum campaign obtained enough signatures, Householder had a back-up plan, a "quick fix," ready to go. The "quick fix" was new legislation Householder had drafted that would declare HB 6's subsidies a tax. **JONES** and **DOWLING** discussed the "quick fix" through the referendum period and arranged for FirstEnergy Service Co. to wire $20 million to Energy Pass-Through, $13 million of which went immediately to Generation Now to support Householder's efforts. Between July 29 and October 22, 2019, FirstEnergy and Energy Pass-Through accounts paid $38 million into Generation Now.

92. During this time, **JONES** and **DOWLING** continued to engage with Householder and his associates regarding the "quick fix" and payments. For example, on or about October 19, 2019, a few days before the ballot referendum's signatures were due, **JONES** texted **DOWLING,** FES Executive A, and FES Executive B, "*Just spoke to the big guy. He's got the 'tax' bill ready to go and believes he's got [Senator 3] on board….*" FES Executive B responded, "*That is good news. Having both [Householder and Senator 3] on board and ready is critical for us next week to be ready to deal with the outcome of the signatures and the court.*" Similarly, on October 10, 2019, when FirstEnergy Service Co. wired $10,000,000 to Generation Now, by way of Energy Pass-Through, Longstreth called **DOWLING** about needing more money, prior to the payment. **JONES** also spoke to Householder about the money prior to the payment. As **JONES** told **DOWLING**, "*I did speak with LH and he says they need it and will spend it. Talked to him about future and he says the future is now. He understands it's not our issue and truly appreciates the support.*" Although **JONES** had said, "*not our issue,*" HB 6's fixed revenue provision was important to FirstEnergy and **JONES** and **DOWLING**. For example, when Longstreth raised the

decoupling provision in HB 6, **DOWLING** responded, "*We'll send the wire today.*" **DOWLING** then worked out the logistics of the payment, texting Individual I, "*Let's roll cej is on board.*" After receiving confirmation that Energy Pass-Through wired the $10 million to Generation Now, **DOWLING** responded, "*Mission accomplished.*"

93. On October 18, 2019, FirstEnergy Service Co. wired another $10,000,000 to Energy Pass-Through, which then wired $3,000,000 to Generation Now a few days later, on October 23, 2019. The day prior to the $10,000,000 wire, **DOWLING** texted **JONES**, explaining that Longstreth said they were looking for $3,000,000 to get through the weekend. **DOWLING** told **JONES** that, "*Larry asked Jeff to call me – which means they want me to talk to you but LH will engage with you if necessary.*" Ultimately, **JONES** directed **DOWLING** to "*[g]ive them the $3M but tell [FES Executive A] I want an IOU.*" In response, **DOWLING** asked, "*Want to do $3m to our C(4) or more while we're at it?*" **JONES** directed **DOWLING**, "*Do $10. Tell [Individual I] I approve. Tell him it's more help for FES. Last sentence is important.*"

94. The day after the $10 million wire to Energy Pass-Through (October 19, 2019), **JONES** texted **DOWLING**, saying, "*LH called to see what we thought about [ a public official's] replacement. First told him it was the worst possible pick. Then gave him the real scoop.*" **DOWLING** remarked, "*I wish we had this state and federal team in place when we first started our generation push. Darn it.*"

95. On October 23, 2019, the day after Energy Pass-Through wired the $3 million payment to Generation Now, **JONES'** reminded FES Executive A of Householder's plan, when the executive told **JONES** that "*[w]aiting for this judge is giving me an ulcer*"—a reference to a legal challenge by the Ballot Campaign as part of its effort to obtain more time to gather signatures. **JONES** responded: "*You are a worrier but then it's a pretty big deal. For what it's worth . . .*

*Householder think it's game over. But that's private conversation unless they've told you the same thing. And Householder has 'quick fix' anyway.*" **JONES** and **DOWLING** had discussed the "quick fix" two days earlier (October 21, 2019), when **DOWLING** texted **JONES**, "*FES' intel is that opponents will bring signatures to Secretary of State today at 4 pm. . . A lot of conversation at FES about the never-ending opponent challenges and the need to pass new legislation. We'll see what happens today*?" **JONES** responded, "*Larry is ready to do new legislation immediately if they turn in signatures.*" **JONES** went on to explain, "*LH says it will NEVER hit the ballot.*"

**Randazzo Gets Rid of the "Ohio 2024 hole" for JONES and DOWLING**

96. On or about November 10, 2019, a few weeks after the Ballot Campaign failed to collect enough signatures to the put the referendum of HB 6 on the ballot (on or about October 22, 2019), **JONES** texted Company C Executive, "*And, the FE rescue project is not over. At EEI financial conference. Stock is gonna get hit with Ohio 2024. Need Sam to get rid of the 'Ohio 2024' hole.*" **JONES's** message about the rescue project followed an earlier exchange between **JONES** and **DOWLING** on November 5, 2019, where **JONES** sent to **DOWLING** an article by Morgan Stanley projecting low growth for FirstEnergy because of "*a rate case review in 2024.*" In his note accompanying the article, **JONES** told **DOWLING**, "*Here's the MS down grade due to the 'Ohio hole.'*" That same day, **DOWLING** texted **JONES** and Individual G a message exchange he had earlier with Randazzo that evening. In the exchange, Randazzo stated, "*The Wolfe report I saw today was more bullish on the FE financial performance. Thanks for sending.*" **DOWLING** responded, "*True, but made clear that the 2024 rate case mandate is part of the reason fe trades at a discount to peers*[,]" to which Randazzo replied, "*Understood- [sic].*"

97. On November 15, 2019, **DOWLING** texted **JONES**, "*I spoke with Sam today. Told me 2024 issue will be handled next Thursday (November 21).*" **DOWLING** later texted,

*"he's going to make the requirement to file go away, but I do not know specifically how he plans to do it."* Then, on or about November 21, 2019, **DOWLING** texted **JONES**, *"Today is our day for action on the 2024 issue."*

98. The following day, November 22, 2019, **JONES** texted Randazzo an image showing FirstEnergy's stock increase with a note that stated, *"Thank you!!"* Randazzo responded, *"Ha – as you know, what goes up may come down. [Name] helped. Thanks for the note. Spoke to mike last night."* **JONES** replied, *"Every little bit helps. Those guys are good but it wouldn't happen without you. My Mom taught me to say Thank you,"* to which Randazzo replied, *"Thanks."* The day before, PUCO had issued a ruling that FirstEnergy was no longer required to file a new rate distribution case in 2024. After the ruling, **DOWLING** texted **JONES** the PUCO decision, which highlighted the following language from the Opinion and Order: *"we find that it is no longer necessary or appropriate for the Companies to be required to file a new distribution rate case at the conclusion of the Companies' current ESP."*

**<u>FirstEnergy's Corrupt Bargains Continue to Payoff</u>**

99. On or about January 9, 2020, **DOWLING** forwarded to **JONES** a message he received from a FirstEnergy employee referencing PUCO *"Staff's position on decoupling"* and followed up with a message stating, *"Saw your email [sic] Unreal what staff did. Of course they can't rewrite the law but now what they've done will expose all of us to what is happening. Nothing is easy."* **JONES** later responded, *"Better get to work!"* **DOWLING** replied, *"On it. [Individual G] is in Columbus and is going to try to see Sam later today. Also, we know Sam is coming to Akron later today to tour the new FES building. I don't know why, but that's another opportunity."* **JONES** responded to the message with a "thumbs up" emoji.

100. On or about January 15, 2020, when it appeared that another commissioner would be appointed to PUCO in 2020, Householder texted **JONES**, "*Who do you like for this PUCO board appointment.*" That evening, **JONES** forwarded Householder's message to **DOWLING** explaining, "*Got this from LH a little while ago.*" **JONES** then copied his response to Householder, "*Let me check and get back to you. But I think Sam wants the incumbent D re-upped because he's very cooperative with Sam.*" **JONES** asked **DOWLING** whether he should confirm his answer to Householder from, "*I think*" to "*yes*," and then continued, "*Tell Sam Larry asked me I [sic] my response was whoever Sam wants.*" **JONES** then texted Householder back as follows: "*[PUCO Official 2] is the commissioner who's up this April. Sam likes [PUCO Official 2]. Sam has been outstanding. Approved our decoupling filing today and got a 5-0 vote including [PUCO Official 2], even though Staff bureaucrats wanted to modify HB 6 language.*" Householder then responded, "*Very good.*" Householder then stated, "*I need to have my appointee to make recommendation to Gov. I will take care of it tomorrow.*"

101. On or about January 22, 2020, Householder forwarded to **JONES** a link to a newspaper article about the HB 6 ballot campaign dropping their legal challenge that was pending on appeal, and wrote, "*We win again*," to which **JONES** responded, "*Great news. . . .*"

**<u>JONES and DOWLING's "Effort $$" Continue</u>**

102. On or about February 15, 2020, **DOWLING** had a text message exchange with a former FirstEnergy executive that reflected his corrupt intent to pay public officials in return for official action. **DOWLING** texted about help from a public official, who **DOWLING** characterized as having been extremely good to us "*on a lot of issues - <u>through the commission and with legislation</u>*," and **DOWLING** continued, that it "*[h]elps to have Sam where he is.*" The former FirstEnergy executive responded, "*It's like a dream!!! But it takes a lot of effort to get them*

*in the right track and holding them there.*" To which **DOWLING** replied, "*You got that right!*" and then followed: "*Effort $$.*"

103. On or about Tuesday, March 3, 2020, Energy Pass-Through wired $2,000,000 to Generation Now. The wire followed a conversation between **JONES** and Householder. Specifically, on February 28, 2020, **JONES** remarked to Individual B that he had, "*[t]alked to Speaker today. He's an expensive friend.*" **JONES** then explained that the Speaker had called **JONES** about his "*term limit initiative*," which would impose "*16 years lifetime max in legislature starting when it passes*" and that Householder would "*get a lot done in 16 more years.*" The next day, **JONES** texted Householder that, "*Mike is contacting Jeff [Longstreth] to do 2 early next week.*" After Longstreth emailed **DOWLING** new wiring instructions for Generation Now, **DOWLING** texted Individual L, "*Good afternoon, [ ]. I sent you an email. On Monday/Tuesday of next week, we are hoping to do a $2M contribution from our C(4) to Generation Now.*" **DOWLING** then texted two FirstEnergy employees, "*We are going to make a significant contribution to Generation Now from Energy Pass-Through next Monday/Tuesday.*" **DOWLING** indicated that keeping Householder in power was "*good for the home team.*" **DOWLING** later cautioned, "*Mums the word to all. $2m.*" On March 3, after receiving confirmation that the Energy Pass-Through wire was "*en route*," **DOWLING** asked Individual L, "*What['s] our C4 balance?*"

104. In a text message exchange on or about March 4, 2020 about possible future favorable action by Randazzo, **JONES** summarized official action already performed by Randazzo at the request of FirstEnergy. Specifically, in response to a text message asking, "*Any luck on talking with Sam on energy license we just received request for additional comments*[?]" **JONES** responded: "*He will get it done for us but cannot just jettison all process. Says the combination of over ruling Staff and other Commissioners on decoupling, getting rid of SEET and burning the*

*DMR final report has a lot of talk going on in the halls of PUCO about does he work there or for us? He'll move it as fast as he can.*"

105. On or about May 13, 2020, when a state aide texted Company C Executive and **DOWLING**, "*Hey guys. Everybody ok in Akron? My internal clock feels than an insane request from FE is overdue by a couple of weeks,*" **DOWLING** responded, "*No[w] that made me laugh. It takes a few more weeks cooking it up in work at home modes*!"

**<u>JONES's and DOWLING's Continuing Concealment</u>**

106. In and around September 2020, **JONES** met with FirstEnergy Service Executive 1 and Individual B and discussed the Department of Justice ("DOJ") investigation into FirstEnergy relating to the federal racketeering indictment in *United States v. Householder*, 1:20-cr-00077 (S.D. Ohio); and they discussed a $400,000 "consulting" payment that FirstEnergy previously made to Individual B, which was paid through FirstEnergy Service Executive 1's department's budget at **JONES**'s direction, but in which **JONES** told FirstEnergy Service Executive 1 to leave **JONES** out of the transaction.

107. Following the conversation, in and around September and October 2020, Individual B directed FirstEnergy Service Executive 1 to alter a document relating to the $400,000 payment, and **JONES** directed FirstEnergy Service Executive 1 to provide false information, including false information relating to the $400,000 payment, to individuals gathering information in response to the indictment in *United States v. Householder*, 1:20-CR-00077 (S.D. Ohio) and federal grand jury subpoenas served on FirstEnergy. Further, **JONES** told FirstEnergy Service Executive 1 that he provided purposefully false information about transactions involving Individual B, including the $400,000 payment, to individuals gathering information in response to the indictment in *United*

*States v. Householder*, 1:20-cr-00077 (S.D. Ohio) and federal grand jury subpoenas served on FirstEnergy.

108. On or about July 28, 2020, shortly after the federal complaint became public in *United States v. Householder*, 1:20-CR-00077 (S.D. Ohio) and related federal grand jury subpoenas were served on FirstEnergy, **JONES's** iPhone 11 Pro Max was imaged at the direction of FirstEnergy and the phone was returned to **JONES**.

109. In and around October 2020, FirstEnergy instructed **JONES** that it needed to re-take possession of the iPhone 11 Pro Max so that it could re-image the phone. When **JONES** returned the iPhone 11 Pro Max to FirstEnergy for re-imaging, on or about October 22, 2020, thousands of messages were missing from the phone, including messages relevant to the federal investigation.

110. Following the federal complaint in *United States v. Householder*, 1:20-cr-00077 (S.D. Ohio) and federal grand jury subpoenas served on FirstEnergy, **DOWLING's** iPhone 10 was imaged on or about July 24, 2020 at the direction of FirstEnergy and the phone was returned to **DOWLING**. **DOWLING's** iPhone 10 contained less than 6,000 messages at the time **DOWLING** gave the phone to FirstEnergy for imaging. Communications between **DOWLING** and **JONES** and others relevant to the federal investigation were missing from the phone when it was imaged.

**In violation of Title 18, United States Code, Section 1962(d).**

## FORFEITURE ALLEGATION

111. The allegations contained in Count One of this Indictment are hereby incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963.

112. Upon conviction of the offense set forth in Count One of this Indictment, the defendants, **CHARLES E. JONES** and **MICHAEL DOWLING**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963:

a. any interest acquired or maintained in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

b. any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Tile 18, United States Code, Section 1963(a)(2); and

c. any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

**SUBSTITUTE ASSETS**

113. If any of the property described above, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. as been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of the defendants, up to the value of the property described above.

**All pursuant to Title 18, United States Code, Section 1963(a) and (m) and Rule 32.2(a) of the Federal Rules of Criminal Procedure.**

**A TRUE BILL**

/s/

**GRAND JURY FOREPERSON**

**KENNETH L. PARKER**
**UNITED STATES ATTORNEY**

Emily N. Glatfelter / Matthew S[...]

**ASSISTANT UNITED STATES ATTORNEYS**